**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────────

**CAR-FRESHNER CORPORATION and**
**JULIUS SAMANN LTD,**

                                        **Plaintiffs,**

        **vs.**                                              **5:22-CV-1305**
                                                              **(MAD/ML)**

**META PLATFORMS, INC.,**

                                        **Defendant.**
────────────────────────────────────────────

**APPEARANCES:**                        **OF COUNSEL:**

**BOND SHOENECK & KING, PLLC**          **LIZA R. MAGLEY, ESQ.**
One Lincoln Center                      **LOUIS ORBACH, ESQ.**
Syracuse, New York 13202
Attorneys for Plaintiffs

**KILPATRICK TOWNSEND**                 **H. FORREST FLEMMING, III, ESQ.**
**& STOCKTON, LLP**                     **R. CHARLES HENN, JR., ESQ.**
1114 Avenue of the Americas – 21st Floor  **WILLIAM H. BREWSTER, ESQ.**
New York, New York 10036
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    Plaintiffs Car-Freshner Corporation ("CFC") and Julius Samann Ltd. ("JSL") (collectively,

"Plaintiffs") initiated this action on December 6, 2022, by filing a complaint.  *See* Dkt. No. 1.

Plaintiffs' claims arise from alleged trademark infringement.

    On January 27, 2023, Defendant Meta Platforms, Inc. ("Meta"), filed a letter motion

seeking to file a motion to dismiss or, in the alternative, a motion to transfer.  *See* Dkt. No. 10.

Following a telephone conference, the Court permitted Plaintiffs to file an amended complaint

and for Meta to subsequently file a motion to dismiss if it deemed one necessary.  *See* Text

Minute Entry 02/13/23.  Plaintiffs filed their amended complaint on February 27, 2023.  *See* Dkt.

No. 13.  Meta filed its motion to dismiss on March 13, 2023.  *See* Dkt. No. 17.  Plaintiffs

responded, and Meta replied.  *See* Dkt. Nos. 21, 22.  For the following reasons, Meta's motion to

dismiss is granted in part and denied in part.

## II. BACKGROUND

JSL owns three trademarks (the "Marks") for Little Trees air fresheners.  *See* Dkt. No. 13

at ¶¶ 2, 16, 18, 31.  CFC is the exclusive licensee of JSL's trademarks.  *See id.* at ¶ 30.  CFC

manufactures the air fresheners in Watertown, New York and DeWitt, Iowa.  *See id.* at ¶ 1.

Plaintiffs' three trademark designs include the Tree Design Mark (the tree shape), the "Little Tree"

Mark, and the "Vanillaroma" Mark.  *See id.* at ¶¶ 16, 18, 20, 31.  Plaintiffs' air fresheners are sold

across the United States and Plaintiffs have created additional merchandise using the Marks

including t-shirts and stickers.  *See id.* at ¶¶ 27, 35-36, 39.  Meta owns and operates the social

media websites Facebook and Instagram.  *See id.* at ¶ 3.  One part of Facebook is Facebook

Marketplace which allows businesses and individuals to sell real and personal property to

consumers.  *See id.* at ¶ 4.  Products are also advertised and sold through Instagram.  *See id.* at ¶ 3.

Plaintiffs discovered that third parties were selling and advertising air fresheners, stickers,

and t-shirts which used Plaintiffs' trademarks on Facebook Marketplace and Instagram.  *See* Dkt.

No. 13 at ¶¶ 80-86, 107-10.  Plaintiffs contend that "[o]n November 9, 2022, a set of these

Infringing Air Fresheners was sold to a customer on Facebook Marketplace for delivery to an

address in Jefferson County, New York."  *Id.* at ¶ 87.  Plaintiffs assert that Meta collected New

York sales tax from the purchase.  *See id.* at ¶ 98.  On November 10, 2022, the customer received

an e-mail from commerce-no-reply@support.Facebook.com with tracking information for the

order, which included the New York address. *See id.* at ¶ 99. "The email was signed 'The Facebook Marketplace Team.'" *Id.* at ¶ 103.

On October 18 and November 9, 2022, two Trademark Report Forms were submitted to Facebook "on Plaintiffs' behalf" which identified the allegedly infringing products and Plaintiffs' Marks. *See* Dkt. No. 13 at ¶¶ 113, 116. Plaintiffs contend that Facebook refused to remove the product listing from Facebook Marketplace. *See id.* at ¶¶ 114, 117. On October 18, 2022, two Trademark Report Forms were submitted to Instagram "on Plaintiffs' behalf," but Instagram did not remove "the post promoting the Infringing T-shirts" or stickers. *Id.* at ¶¶ 118, 123. Plaintiffs then submitted evidence of their trademark registration numbers to Instagram. *See id.* at ¶¶ 120, 122, 125, 127. As of the date Plaintiffs filed their original complaint, December 6, 2022, the allegedly infringing products had not been removed from Facebook or Instagram. *See id.* at ¶ 128; *see also* Dkt. No. 1. Plaintiffs allege that Meta's refusal to remove the products from Facebook and Instagram infringed on Plaintiffs' trademarks. *See* Dkt. No. 13 at ¶ 133.

Meta contends that CFC uses Facebook and Instagram to promote and advertise its products and has been using Facebook since 2015 and Instagram since 2019. *See* Dkt. No. 17-1 at 13. Meta states that users must agree to its Terms of Service and Use when it creates an account. *See id.* The current Facebook Terms provide as follows:

> You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County.

*Id.* at 14. The current Instagram Terms state as follows:

> Except as provided below, you and we agree that any cause of action, legal claim, or dispute between you and us arising out of or

> related to these Terms or Instagram ("claim(s)") must be resolved
> by arbitration on an individual basis . . .
>
> The following claims don't have to be arbitrated and may be
> brought in court: disputes related to intellectual property (like
> copyrights and trademarks), violations of our Platform Policy, or
> efforts to interfere with the Service or engage with the Service in
> unauthorized ways (for example, automated ways) . . . .
>
> For any claim that is not arbitrated or resolved in small claims
> court, you agree that it will be resolved exclusively in the U.S.
> District Court for the Northern District of California or a state court
> located in San Mateo County.

*Id.*[1] Meta confirms that "automated emails may be sent by Facebook Marketplace." *Id.* at 13.

Additionally, if a customer uses "shipping and checkout," "the seller pays 5% (with a forty cent

minimum as a selling fee (regardless of who buys the product, where it is shipped, etc.) and

Facebook Marketplace collects the applicable sales tax." *Id.* at 13, n.3.  However, Meta argues

that this Court does not have personal jurisdiction over Meta because it has not purposefully

availed itself of New York's jurisdiction, and, even if it has, the case should be transferred to the

Northern District of California or dismissed for failure to state claim.  *See id.* at 10-33.

### III. DISCUSSION

**A.     Legal Standard**

Meta moves to dismiss Plaintiffs' amended complaint under Rule 12(b)(2) of the Federal

Rules of Civil Procedure.  *See* Dkt. No. 17-1 at 15-20.  "'A plaintiff bears the burden of

demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit.'"

*Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (quoting

*Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)).  When deciding a

---

[1] Prior versions of the Terms were the same.  *See* Dkt. Nos. 17-8, 17-10, 17-11, 17-12, 17-14, 17-15, 17-16, 17-18, 17-19.  Throughout this Memorandum-Decision and Order, the Court will refer to the Facebook and Instagram forum-selection clauses as the "Terms."

Rule 12(b)(2) motion, the Court may consider materials outside the pleadings "without converting [the] motion to dismiss for lack of personal jurisdiction into a motion for summary judgment." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). "Where, as here, a district court in adjudicating a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) 'relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction.'" *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quotation omitted); *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015). "This prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).

"In evaluating whether the requisite showing has been made, [courts] construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citing *Chloé*, 616 F.3d at 163). "A *prima facie* showing of jurisdiction 'does not mean that plaintiff must show only some evidence of jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction.'" *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010) (citation omitted). Pleadings that assert only "conclusory non-fact-specific jurisdictional allegations" or state a "legal conclusion couched as a factual allegation" do not meet this burden. *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted). Finally, although a court is to assume the truth of all well-pled factual allegations that support a finding of personal jurisdiction, it should "not draw 'argumentative inferences' in the plaintiff's

favor." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).

      Meta also moves to transfer the case to the Northern District of California.  *See* Dkt. No. 17-1 at 20-23.  Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought, or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  "Section 1404(a) reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  "'[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis.'"  *View 360 Solutions, LLC v. Google, Inc.*, No. 1:12-CV-1352, 2013 WL 998379, *1 (N.D.N.Y. Mar. 13, 2013) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992)) (citation omitted).  "Motions to transfer venue are governed by a two-part test: (1) whether the action to be transferred 'might have been brought' in the transferee venue; and (2) whether the balance of convenience and justice favors transfer."  *Id.* (additional quotation marks omitted) (quoting *Rescuecom Corp. v. Chumley*, 522 F. Supp. 2d 429, 448-49 (N.D.N.Y.  2007)).  "The moving party has the burden of demonstrating the desirability of transfer . . . ."  *Id.*

      In the alternative, Meta moves to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6). *See* Dkt. No. 17-1 at 23-33.  A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007).  In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all

reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading.  *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citation omitted).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," and present claims that are "plausible on [their] face."  *Id.* at 555, 570 (citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed."  *Twombly*, 550 U.S. at 558, 570.

**B.     Personal Jurisdiction**

In determining whether personal jurisdiction exists, courts employ a two-step inquiry.

First, the Court must determine whether there is a "statutory basis for exercising personal

jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013) (citation

omitted).  Second, the Court must determine "whether personal jurisdiction comports with due

process protections established under the Constitution." *Eades v. Kennedy, PC Law Offices*, 799

F.3d 161, 168 (2d Cir. 2015) (citation omitted).

There are two types of personal jurisdiction that a court may exercise over a foreign

corporation.  *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016).  First, there

is general jurisdiction, which "permits a court to adjudicate any cause of action against the

corporate defendant, wherever arising, and whoever the plaintiff." *Id*. (citation omitted).[2]

Second, there is specific jurisdiction, which "is available when the cause of action sued upon

arises out of the defendant's activities in a state." *Id.*

*1. Specific Jurisdiction*

New York's long-arm statute allows for personal jurisdiction over non-domiciliaries where

the non-domiciliary,

> (1) transacts any business within the state or contracts anywhere to
> supply goods or services in the state; or
>
> (2) commits a tortious act within the state . . .; or
>
> (3) commits a tortious act without the state causing injury to person
> or property within the state . . . if [it]
>
>> (i) regularly does or solicits business, or engages in any
>> other persistent course of conduct, or derives substantial
>> revenue from goods used or consumed or services rendered,
>> in the state, or

---

[2] Plaintiffs do not contend that there is general jurisdiction.  *See generally* Dkt. No. 21.

>(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
>
>(4) owns, uses, or possess any real property situations within the state.

N.Y. C.P.L.R. § 302(a).  Plaintiffs argue that this Court has personal jurisdiction over Meta under N.Y. C.P.L.R. § 302(a)(1), (2), and (3).  *See* Dkt. No. 21-9 at 10-19.

### a. N.Y. C.P.L.R. § 302(a)(1)

"'To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity.'"  *Licci ex rel. Licci*, 732 F.3d at 168 (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).  "For a cause of action to arise from the defendant's business transaction in the state, there must be 'an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'"  *Deitrick v. Gypsy Guitar Corp.*, No. 16-CV-616, 2016 WL 7494881, *5 (S.D.N.Y. Dec. 28, 2016) (quoting *Saudi v. Marine Atl., Ltd.*, 306 Fed. Appx. 653, 654 (2d Cir. 2009)).

Under Section 302(a)(1), "'jurisdiction is proper even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'"  *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (2016) (citing *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)).  "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg*, 9 N.Y.3d at 380 (citations omitted).  Determining purposeful availment requires the Court to make an objective inquiry by "closely examin[ing] the defendant's contacts

for their quality." *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 338 (2012).  Section 302(a) is a "single act statute": a "single act" or transaction "'is sufficient to invoke jurisdiction,'" so long as the relevant New York activities "'were purposeful and there is a substantial relationship between the transaction and the claim asserted.'"  *Am./Int'l 1994 Venture v. Mau*, 146 A.D.3d 40, 52 (2d Dep't 2016) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Meta argues there is no personal jurisdiction under § 302(a)(1) because Plaintiffs' "Amended Complaint does not allege any facts, other than automated responses, showing that Meta—as opposed to the seller—intended for the product to be shipped into New York.  Indeed, the seller, not Meta, made the sale in the first instance." Dkt. No. 17-1 at 16.  In support of its argument, Meta relies on *Prashaw v. Titan Mining Corp.*, No. 8:20-CV-778, 2022 WL 3646984 (N.D.N.Y. Aug. 24, 2022) and *Spratley v. FCA US LLC*, No. 3:17-CV-0062, 2017 WL 4023348 (N.D.N.Y. Sept. 12, 2017).  *See id.* at 16-17.  Plaintiffs argue that Meta's reliance on those cases is misplaced, and the Court agrees.  *See* Dkt. No. 21-9 at 13-14.

In *Prashaw*, the plaintiff brought a suit against two corporate defendants following a brake system failure in an elevator which caused injury to the plaintiff.  *See Prashaw*, 2022 WL 3646984, at *1.  The corporate defendants filed a third-party complaint against the company who evaluated and tested the allegedly faulty equipment twelve years before the incident.  *See id.*  The Court concluded that the third-party defendant could not have known, nor reasonably should have known, that the faulty product would end up in New York because the third-party defendant was a Canadian company who tested the product according to Canadian standards and it contracted with another Canadian company to test the system.  *See id.* at *7.  Additionally, although the inspection label contained marks and information concerning United States standards, the third-party defendant certified its compliance with only the Canadian standards.  *See id.*  Thus, this

Court concluded that the third-party plaintiffs' conclusory allegation that the third-party defendant knew or should have known that the brake system was bound for New York was insufficient to establish personal jurisdiction under § 301(a)(1). *See id.*

In *Spratley*, the plaintiff was a New York resident who purchased a Chrysler vehicle in New Jersey. *See Spratley*, 2017 WL 4023348, at *1. The Court explained that "[t]he complaint does not allege any facts indicating that Spratley's claims arise from Chrysler's business activity in New York." *Id.* The plaintiff argued that advertisements in New York allowed the Court to exercise specific jurisdiction over Chrysler. *See id.* The Court rejected this argument because "the advertisements that [p]laintiffs cite in their opposition were not even Chrysler advertisements. Instead, they were advertisements for the dealership that sold Spratley his car, and that dealership is not a party in this case." *Id.* (citations omitted). "The Court [wa]s not persuaded that advertising directed at New York by a third-party dealership provides the basis for specific jurisdiction over Chrysler with regard to Spratley's claims." *Id.* (citations omitted).

Here, Plaintiffs allege that Meta (1) advertised other items for sale in and around Watertown, New York; (2) requested a delivery address from the buyer of the air fresheners, which the buyer listed as Jefferson County, New York; (3) confirmed the New York address on its checkout page and in a follow-up e-mail with tracking information; and (4) calculated and collected New York sales tax. *See* Dkt. No. 21-9 at 10. Plaintiffs contend that these actions suffice to establish personal jurisdiction. *See id.* Meta does not deny Plaintiffs' allegations. *See generally* Dkt. No. 17-1. Rather, Meta argues that the actions cannot establish specific jurisdiction because Plaintiffs manufactured the sale, and Meta sent only one automated response about the product being shipped to New York. *See id.* at 16-17.

"Generally, a website that only provides information about an item for sale and contact information for the seller, without any ability to directly purchase the items through the website is considered 'passive' and therefore 'insufficient to demonstrate that the website operator has purposefully availed itself of'" a particular jurisdiction. *Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 515 (E.D.N.Y. 2011) (quoting *Zibiz Corp. v. FCN Tech. Solutions*, 777 F. Supp. 2d 408, 423 (E.D.N.Y. 2011)). "[A] website is [also] considered passive and insufficient to confer jurisdiction where . . . the only purported 'exchange of information' available on the website is a direct link allowing a user to contact the seller." *Id.* (citations omitted). This Court has explained "that § 302 requires 'some additional evidence of a defendant's "purposeful availment" of the forum beyond that defendant's maintenance of an interactive commercial website, even when the website permits consumers to place orders online.'" *RVDirect.com v. Worldwide RV*, No. 1:10-CV-0701, 2010 WL 5391535, *5-6 (N.D.N.Y. Dec. 21, 2010) (declining to find jurisdiction under § 302 where "there is no indication that any commercial activity occurred in New York" and although the [p]laintiffs alleged that "four other sales [were made] to New York residents . . . all of these sales and deliveries were made in its Arizona dealership").

Neither party addresses whether Meta's websites—Facebook Marketplace and Instagram—are interactive or passive. *See generally* Dkt. Nos. 17-1, 21-9, 22. As to Instagram, Plaintiffs' allegations relate to only passive conduct. Plaintiffs allege that advertisements of infringing products posted on Instagram contained "an active link to the seller's commercial website where customers can shop." Dkt. No. 13, at ¶ 110. Plaintiffs do not allege that the products could be purchased directly through Instagram. Accordingly, Plaintiffs have not alleged that the website is interactive such that Meta could have known that any product was being sent to New York. *See Skrodzki*, 810 F. Supp. 2d at 515.

Plaintiffs' allegations concerning Facebook Marketplace reflect that the website is used for more than communicating information.  A buyer can directly purchase an item through the website and all communication regarding a sale is available through the website.  *See* Dkt. No. 13 at ¶¶ 87-104.  This is undoubtedly interactive.  However, there must be "more" than just an interactive website for a defendant to purposefully avail itself of a specific jurisdiction.  *See Chloe*, 616 F.3d at 170.  Meta argues that the only additional conduct was the single sale of an infringing product which was manufactured by Plaintiffs.  *See* Dkt. No. 17-1 at 18-19; Dkt. No. 22 at 9.  Meta argues that because the sale was manufactured by Plaintiffs, it cannot be used to establish jurisdiction.  *See id.*

Plaintiffs allege that "a set of the[] Infringing Air Fresheners was sold to a customer on Facebook Marketplace for delivery to an address in Jefferson County, New York."  Dkt. No. 13 at ¶ 87.  Leah Waite-Holland, CFC's Senior Legal Manager, declares that she "purchased the Infringing Air Fresheners" and "input the information requested by Facebook Marketplace, including a delivery address in Jefferson County, New York, which [she] specified as the home address of [her] CFC colleague at the time[.]"  Dkt. No. 21-1 at ¶¶ 7, 9.  Plaintiffs allege that "Meta calculated and collected New York sales tax" from the purchase.  Dkt. No. 13 at ¶ 98.  Plaintiffs then explain that the confirmation page for the product listed the New York address and an e-mail from "The Facebook Marketplace Team" provided tracking information for the sale which included the New York address.  *Id.* at ¶¶ 100, 103.  Plaintiffs also allege, "[u]pon information and belief, Meta is authorized to do business in New York, and maintains a substantial corporate office and thousands of employees in this state."  *Id.* at ¶ 14.  Additionally, "[t]he Facebook Marketplace page on which the listing for the Infringing Air Fresheners appeared also included 'Today's picks' from Facebook Marketplace of items and real estate available for

purchase or rent in and around Watertown, New York." *Id.* at ¶ 88.  The items include real property, vehicles, gaming devices, and workout equipment.  *See* Dkt. No. 21-2 at 3-8.  Meta does not dispute these allegations.

This is not the first time Ms. Waite-Holland has taken such actions.  In 2019, she "ordered 500 units of allegedly infringing BLACK ICE merchandise from [defendant] Scented Promotions's interactive website.  The order was directed to be shipped to the home address of another CFC employee . . . in Philadelphia, New York. "  *Car-Freshner Corp. v. Scented Promotions, LLC*, No. 5:19-CV-1158, 2020 WL 1188055, *4 (N.D.N.Y. Mar. 12, 2020) (citations omitted).  The Court vacated an entry of default judgment because there appeared to be a meritorious defense to the exercise of personal jurisdiction over the defendant because "a finding of personal jurisdiction may not rest solely on such a purchase into the forum state instigated by a plaintiff . . . ."  *Id.* at *6; *see also Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 935 F. Supp. 2d 615, 623 (S.D.N.Y. 2013) (citations omitted) ("While there is not unanimity on this issue, the vast weight of authority is that a finding of personal jurisdiction may not rest solely on an act such as this instigated by a plaintiff.  Courts in this District and elsewhere have expressed 'hostility towards finding jurisdiction under such potentially manufactured circumstances'").

In *Car-Freshner Corp.*, the Court relied in part on the Second Circuit's decision *Chloe v. Queen Bee of Beverly Hills, LLC.  See Car-Freshner Corp.*, 2020 WL 1188055, at *5 (citing *Chloe*, 616 F.3d at 161-2).  In *Chloe*,

> [i]n analyzing the issue of personal jurisdiction, the Second Circuit found that the minimum contacts inquiry of the long-arm statute was satisfied, specifically in light of the following factors: (1) defendant operated a sufficiently interactive website which offered counterfeit products for sale and shipment to New York consumers, (2) defendant sold and shipped a counterfeit bag to an agent of the plaintiff in New York, and (3) defendant engaged in fifty-two

> separate transactions in which other merchandise was shipped into
> New York.  The Second Circuit emphasized the relevance of the
> 'other New York transactions to their personal jurisdiction inquiry.

*Id.* (citing *Chloe*, 616 F.3d at 161-62).

The Second Circuit left open "the question of whether the 'single act' of shipping" a counterfeit item "to an agent of the plaintiff, by itself, constitutes an act of trademark infringement."  *Chloe*, 616 F.3d at 165, n.3.  However,

> an employee's single act of shipping a bag—*any* bag, not
> necessarily a counterfeit one—into the State of New York,
> combined with the employer's other business activity involving the
> State of New York, gives rise to an inference that the defendant
> "purposefully avail[ed himself] of the privilege of conducting
> activities within the forum State, thus invoking the benefits and
> protections of its laws[.]"

*Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

In *Chloe*, the Second Circuit explained that after "[h]aving identified the single act of an out-of-state defendant employee shipping an item into New York, we next review the record as it relates to [the defendant's] contacts with New York.  In this regard, we note that both New York's long-arm statute and the Due Process Clause require that [defendant's] contacts with New York have some connection to Chloé's trademark infringement claim."  *Chloe*, 616 F.3d at 166.  The Second Circuit concluded that the defendant had "the relevant minimum contacts" with New York because "[i]t further sold other designer merchandise to New York consumers.  Thus, these additional contacts show that the shipment of a counterfeit Chloé bag was not, as the district court thought, a 'one-off transaction,' but rather a part of a larger business plan purposefully directed at New York consumers."  *Id.* (internal citation omitted).

Since *Chloe*, the Southern District of New York has concluded, "[i]t is well established that a 'single act' of selling counterfeit goods into New York satisfies the long-arm statute under

Section 302(a)(1)." *Caliko, SA v. Finn & Emma, LLC*, No. 21-CV-3849, 2022 WL 596072, *3 (S.D.N.Y. Feb. 28, 2022) (citing, *inter alia*, *Poof-Slinky, LLC v. A.S. Plastic Toys Co.*, No. 19-CV-9399, 2020 WL 5350537, *4 (S.D.N.Y. Sept. 4, 2020) (holding defendant was subject to personal jurisdiction because, inter alia, it sold allegedly counterfeit products to at least one New York customer).  Additionally, "[i]n [patent, trademark, or copyright] cases, [] courts found a direct relationship between the website and the underlying claim, and thus grounds for asserting personal jurisdiction over the defendant, where the infringing mark was visible on the website or the infringing products were advertised on the website."  *Skrodzki*, 810 F. Supp. 2d at 517-18 (citing *New Angle Pet Prods. v. MacWillie's Golf Prods.*, No. 06-CV-1171, 2007 WL 1871345, *3 (E.D.N.Y. June 28, 2007); *Hsin Ten Enter. USA, Inc. v. Clark Enter.*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000)).

In *Hsin*, the defendant's websites "enable the viewer to purchase [an] Exercise Machine online, download an order form, download an application to become an 'independent affiliate', and ask questions of an online representative."  *Hsin Ten Enter. USA, Inc.*, 138 F. Supp. 2d at 456.  "Furthermore, defendants have affiliates who reside in New York, have representatives who have appeared in trade shows in New York, and have sold several Exercise Machines to New York residents."  *Id.*  The court concluded that exercising jurisdiction under § 302(a)(1) was appropriate because "[t]he patent infringement claims arise out of [the plaintiff's] 'use and sale' of the Exercise Machines.  The use and sale of the Exercise Machines is caused, at least in part, by the Websites and the presence of representatives and affiliates in New York."  *Id.*

The difficulty presented here, which does not exist in *Chloe* and the aforementioned district court cases, is that Meta is not the direct seller of the allegedly infringing product.  *See Chloe*, 616 F.3d at 162.  The seller is an unnamed third-party who used Meta's websites to

advertise and sell allegedly infringing products.  There are no allegations that Meta shipped the infringing air fresheners, and it is well understood that Facebook contains "advertisements viewable by anyone in New York or throughout the world."  *Skrodzki*, 810 F. Supp. 2d at 517 (citation and quotation marks omitted).

As Ms. Waite-Holland declared, the "Facebook Marketplace Team" sent an e-mail confirming the purchase and providing tracking information.  Dkt. No. 21-1 at ¶ 22; *see also* Dkt. No. 21-5 at 2.  The e-mail contained the New York delivery address.  *See* Dkt. No. 21-5 at 2. Generally, this would be enough to establish personal jurisdiction under section 302(a)(1).  *See Audiovox Corp. v. S. China Enter., Inc.*, No. 11-CV-5142, 2012 WL 3061518, *3 (E.D.N.Y. July 26, 2012) ("[I]f a website is interactive and allows a buyer in New York to submit an order online, courts typically find that the website operator is 'transacting business' in New York and is therefore subject to the court's jurisdiction").  Yet, the sale was manufactured by Plaintiffs and "it is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff' with the forum to establish specific jurisdiction."  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016) (citation and quotation marks omitted).

Section 302(a)(1) allows for the exercise of jurisdiction where the nondomiciliary "transacts *any* business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1).  Meta has a corporate office and employees in New York.  *See* Dkt. No. 13 at ¶ 14; *see also* Dkt. No. 22 at 11.  It also lists products and property in and around New York, and specifically presents those products to New York users.  *See* Dkt. No. 13 at ¶ 88; *see also* Dkt. No. 21-2 at 3-8.  This is evidence that Meta knew it was engaging in business in New York either at its corporate office or through the facilitation of sales in New York.  "[I]f a

company 'wish[es] to operate an interactive website accessible in New York, there is no inequity in subjecting [it] to personal jurisdiction here.'" *Mattel, Inc. v. Animefun Store*, No. 18-CV-8824, 2020 WL 2097624, *4 n.7 (S.D.N.Y. May 1, 2020) (citing *Thomas Publ'g Co. v. Indus. Quick Search*, 237 F. Supp. 2d 489, 492 (S.D.N.Y. 2002)); *see also Poof-Slinky, LLC v. A.S. Plastic Toys Co.*, No. 19-CV-9399, 2020 WL 5350537, *4 (S.D.N.Y. Sept. 4, 2020) ("But that [p]laintiff directed the purchase of the allegedly counterfeit products is irrelevant to the question of whether the [] Defendants have purposefully availed themselves of doing business in this forum").

Meta has "reached out beyond" Delaware and California by having a corporate office in New York, employing people in New York, collecting New York sales tax, and presenting New York products for sale to New York users. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 529 U.S. —, 141 S. Ct. 1017, 1025 (2021) (citations and quotation marks omitted) (alterations in original) (explaining that the plaintiff "must show that the defendant deliberately reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there. . . . [and] there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."); *cf. Frawley v. Nexstar Media Grp., Inc.*, No. 1:23-CV-10384, 2023 WL 6065768, *4 (D. Mass. Sept. 18, 2023) ("[The plaintiff] does not make any assertion that [the defendant] actively solicited Massachusetts citizens more than citizens of any other state.  He does not assert that they actively solicited Massachusetts residents to sign up for the newsletter at issue here.  Nor are there any allegations that [the news company] has any agents in the Commonwealth or agreements to do business therein.").  Insofar as Meta emphasizes that its e-mailed responses regarding the purchase of the infringing product were automated, it does not provide any authority to support a theory that if a communication is

automated, it cannot be used to attribute knowledge to the communicating party.  *See* Dkt. No. 17-1 at 16.

Based on the foregoing, although the manufactured sale of the infringing product, standing alone, would be insufficient to establish jurisdiction, the shipment of that product into New York from Meta's interactive website, combined with Meta's collection of New York sales tax, employment of an office and individuals in New York, and maintenance of an interactive website which advertises and targets New York products to New York consumers, suffices to establish personal jurisdiction under § 302(a)(1).

### b.  N.Y. C.P.L.R. § 301(a)(3)

Alternatively, the Court has personal jurisdiction over Meta under N.Y. C.P.L.R. § 302(a)(3)(i) and (ii) which create personal jurisdiction if the defendant "commits a tortious act without the state causing injury to person or property within the state" and if it "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state," or "(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. § 302(a)(3).

Meta's only argument in its motion to dismiss pertaining to this section 302(a)(3) is that Plaintiffs have failed to establish that Meta expected or reasonably could have expected its conduct to have consequences in New York.  *See* Dkt. No. 17-1 at 17.  In its reply memorandum, Meta adds that its office in New York cannot establish jurisdiction under section 302(a)(3)(i) because its office is not related to Plaintiffs' cause of action.  *See* Dkt. No. 22 at 10.

First, section 302(a)(3)(i) does not require the business that a defendant "regularly does" to relate to the underlying cause of action.  N.Y. C.P.L.R. 302(a)(3)(i); *see also Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)  (concluding that a "long-term apartment rental was sufficient to constitute a persistent course of conduct by the firm. Although this jurisdictional predicate has not often been expounded upon in the New York courts, there is nothing in the plain language of § 302(a)(3)(i) which suggests that the relevant contacts must be solely business-related; in fact, this predicate's juxtaposition as an alternative to 'regularly do[ing] or solicit[ing] business' suggests precisely the opposite").  Therefore, Meta's maintenance of an office and employment of people in New York satisfies this requirement.  *See* Dkt. No. 13 at ¶ 14; *see also Bouchard v. La Parmigiana S.R.L.*, No. 5:15-CV-0865, 2016 WL 81496, *3 (N.D.N.Y. Jan. 7, 2016) (noting that section 302(a)(3)(i) could not be satisfied where the "[d]efendant has no employees, property, office, bank accounts, or address in New York").  Insofar as Meta raises a due process concern, that will be separately addressed, below.  *See Bank Brussels Lambert*, 305 F.3d at 127 (citation omitted) ("[A]s the New York Court of Appeals has made clear, the constitutional analysis is a distinct step from the statutory one; it is only once the long-arm statute is deemed satisfied that the court need examine whether due process is likewise comported with").

Second, Plaintiffs have provided enough information to support a conclusion that Meta could have reasonably expected its conduct to have consequences in New York.  To support its argument, Meta again relies on *Prashaw*, but as explained, *Prashaw* is easily distinguished.  *See* Dkt. No. 17-1 at 17.  Meta sent communications to Plaintiffs which included the New York shipping address.  *See* Dkt. No. 13 at ¶¶ 92, 94, 99-100.  Meta also advertised and presented other goods and property for sale in and around New York to its users.  *See id.* at ¶ 88.  This is different from *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 935 F. Supp. 2d 615, 626 (S.D.N.Y. 2013), which Meta cites to support its argument.  *See* Dkt. No. 22 at 10.  In *Buccellati*, since the

20

defendant company "was founded, the only sale of any merchandise to a New York customer is

the sale to [p]laintiffs' investigator.  Moreover, [d]efendants have offered uncontradicted evidence

that their business is conducted through private parties, by word of mouth, and through 'trunk

shows' at retailers or in private homes—none of which has taken place in New York."  *Buccellati*

*Holding Italia SPA*, 935 F. Supp. 2d at 626-27.  Meta has not presented any evidence that their

business does not take place in New York.  *See* Dkt. Nos. 17-1, 22.  Rather, Plaintiffs present

evidence that Meta, through its interactive website, advertises goods in New York.  *See* Dkt. No.

21-2 at 3-8.

　　　Meta also cites *Brownstone Inv. Grp. LLC v. Bonner & Partners, LLC*, No. 20-CV-7351,

2021 WL 3423253, *4 (S.D.N.Y. Aug. 5, 2021).  *See* Dkt. No. 22 at 10.  In *Brownstone*, the court

emphasized that to satisfy section 302(a)(3)(ii), "courts look for 'tangible manifestations' of an

'intent to target New York.'"  *Brownstone Inv. Grp. LLC*,  2021 WL 3423253, at *4  (quoting

*Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 423-24 (S.D.N.Y. 2009)).  The

court concluded that "putting to the side [p]laintiff's manufactured sale post-litigation, [p]laintiff

merely alleges that [d]efendants' website is available to consumers in New York.  It does not

allege any 'tangible manifestations.'"  *Id.* (citations omitted).  Meta's advertisement of New York

products and property are tangible manifestations that evidence an intent to target New York

users.  *See* Dkt. No. 13 at ¶¶ 88; *see also* Dkt. No. 21-2 at 3-8.  Meta does not argue otherwise.

*See generally* Dkt. Nos. 17-1, 22.  Thus, there is sufficient evidence that Meta regularly does

business in New York and could have reasonably expected its conduct to have consequences in

the State such that the Court may exercise personal jurisdiction over Meta pursuant to N.Y.

C.P.L.R. § 302(a)(3)(i) and (ii).

### c. Due Process

"[C]onstitutional due process ensures that a court will exercise personal jurisdiction over a defendant only if the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 86 (2d Cir. 2023) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (quotation marks omitted). "Due process considerations require that the defendant 'have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Licci ex rel. Licci*, 732 F.3d at 169 (quoting *Int'l Shoe*, 326 U.S. at 316). The Second Circuit has noted that it would be "rare" and "unusual" for section 302(a)(1) of New York's long-arm statute to be satisfied, but for constitutional due process to be unsatisfied. *Id.* at 170.

Meta argues that the only suit-related conduct Plaintiffs allege is the sale Plaintiffs manufactured, which does not establish purposeful availment sufficient to satisfy due process requirements. *See* Dkt. No. 17-1 at 18. Meta argues that its "offices and employees in New York . . . are irrelevant to the due process analysis." Dkt. No. 22 at 11. Meta acknowledges that it collects sales tax from products regardless of where it is purchased and shipped. *See* Dkt. No. 17-1 at 13, n.3. That would include New York. In its reply, Meta says nothing of its collection of New York sales tax from Facebook Marketplace sales, including the sale of the infringing product. *See* Dkt. No. 22; *see also* Dkt. No. 13 at ¶ 98. Nor does Meta discuss its "Today's Picks" section on Facebook Marketplace, which, as alleged, targets individuals in New York by showing them additional products near them that are available for purchase. *See generally* Dkt. Nos. 17-1, 22; *see also* Dkt. No. 13 at ¶ 88. Meta also does not present authority to support a contention that, because some of its services are automated, such as sending an e-mail or showing

additional products near a user, it cannot be said to be availing itself of a specific jurisdiction because products are being sold, through its website, to that place. As alleged in Plaintiffs' amended complaint, Meta's conduct concerns its maintenance of an interactive website which allows third parties to sell and ship products across the United States. That includes New York. It is this conduct which gives rise to Plaintiffs' claims.

The Court agrees that "[i]t is 'insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (quoting *Waldman*, 835 F.3d at 337); *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("These same principles apply when intentional torts are involved. In that context, it is likewise insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff").

In *Walden*, the Supreme Court concluded that "*Calder v. Jones*, 465 U.S. 783, illustrates the application of these principles." *Walden*, 571 U.S. at 286. The Supreme Court explained that in *Calder*, a California actress brought a suit against a Florida reporter and editor who published an article in a national newspaper. *See id.* at 286-87. The Supreme Court "held that California's assertion of jurisdiction over the defendants was consistent with due process. Although we recognized that the defendants' activities 'focus[ed]' on the plaintiff, our jurisdictional inquiry 'focuse[d] on "the relationship among the defendant, the forum, and the litigation."'" *Id.* at 287 (quoting *Calder*, 465 U.S. at 788). "Specifically, we examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story." *Id.*

23

Here, Meta created contacts with New York by managing an interactive website which allowed a third party to sell and ship products in New York. Meta collected New York sales tax on the purchase. Meta sent an e-mail confirming that the product was being sent to New York. When the user was reviewing one product, Meta advertised additional products near them, *i.e.*, in New York.

The Southern District of New York has noted that the Southern District is "split on what specific actions, if any, a defendant must take, in addition to operating a website accessible from New York, to constitute 'transacting business in New York' for jurisdictional purposes." *IdeaVillage Prod. Corp. v. A1559749699-1*, No. 1:20-CV-04679, 2022 WL 204214, *3 (S.D.N.Y. Jan. 24, 2022). The court "previously held that where a plaintiff 'cannot point to a single sale that [d]efendants made into New York or any action that [d]efendants took to target their sales activity into this state,' no specific personal jurisdiction exists over [d]efendants.'" *Id.* (quoting *Am. Girl, LLC v. Zembrka*, No. 1:21-CV-02372, 2021 WL 1699928, *5 (S.D.N.Y. Apr. 28, 2021)). Not only does Meta maintain a highly interactive website (Facebook Marketplace), but it collected New York sales tax, the infringing product "actually made it to New York," and Meta maintains the "Today's Picks" page which targets New York products to New York consumers. *Id.* This is sufficient to establish the minimum contacts necessary to satisfy due process requirements.

"A defendant can [] 'structure [its] primary conduct' to lessen or avoid exposure to a given State's courts." *Ford Motor Co.*, 141 S. Ct. at 1025 (citation omitted). Meta does not contend that it limits its contacts with New York in any way. Meta notes that it collects sales tax and a selling fee "regardless of who buys the product, where it is shipped, etc." Dkt. No. 17-1 at 13, n.3. It does not deny collecting such fees from New York. *See id.*; *see also Licci ex rel. Licci*, 732 F.3d at 171 (alterations in original) ("[T]he selection and repeated use of New York's banking system,

as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes 'purposeful[ ] avail[ment] . . . of the privilege of doing business in [New York]'"). Meta maintains an interactive website which reaches New York because it allows for goods to be advertised, sold, and shipped in New York to New York users and consumers. It then collects money on those sales. Advertisement and sales of the infringing products, through Meta's websites, have created the underlying controversy. Based on the foregoing, Meta's contacts with New York satisfy due process and Meta's motion is denied on this ground.[3]

## C.   Motion to Transfer

Pursuant to 28 U.S.C. § 1391,

(b) A civil action may be brought in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). 28 U.S.C. § 1404 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "The movant bears the burden of establishing the

---

[3] As the Court concludes that it has personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1) and (a)(3), which satisfy due process, the Court will not address Meta's alternative ground for dismissal for lack of personal jurisdiction. *See* Dkt. No. 17-1 at 17.

propriety of transfer by a clear and convincing showing.  District courts have broad discretion in

making determinations of convenience under Section 1404(a) and notions of convenience and

fairness are considered on a case-by-case basis."  *Horanzy v. Vemma Nutrition Co.*, 87 F. Supp.

3d 341, 346 (N.D.N.Y. 2015) (citations and quotation marks omitted).  In determining the

appropriateness of transfer, the Court considers the following factors:

> (1) the plaintiff's choice of forum; (2) the convenience of witnesses;
> (3) the location of relevant documents and relative ease of access to
> sources of proof; (4) the convenience of the parties; (5) the locus of
> operative facts; (6) the availability of process to compel the
> attendance of unwilling witnesses; (7) the relative means of the
> parties; (8) the proposed forum's familiarity with the governing law;
> and (9) trial efficiency and the interests of justice, based on a
> totality of the circumstances.

*Id.* (citation omitted).

"The presence of a [valid and enforceable] forum-selection clause . . . in [a] case will be a

significant factor that figures centrally in the district court's calculus [when deciding a motion to

transfer venue under 28 U.S.C. § 1404(a)]."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29

(1988).  This is because "[t]he flexible and individualized analysis Congress prescribed in

§ 1404(a) [] encompasses consideration of the parties' private expression of their venue

preferences."  *Id.* at 29-30; *see also Commander v. Am. Cruise Lines, Inc.*, 389 F. Supp. 3d 180,

184 (N.D.N.Y. 2019) ("A forum-selection clause 'may be enforced through a motion to transfer

under § 1404(a)'") (quoting *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571

U.S. 49, 59 (2013)).  "The presence of a valid forum-selection clause requires district courts to

adjust their usual § 1404(a) analysis . . . ."  *Commander*, 389 F. Supp. 3d at 188.  If there is a valid

forum-selection clause,

> (1) a "plaintiff's choice of forum merits no weight . . . [and] as the
> party defying the forum-selection clause, has the burden of

> establishing that transfer to the forum for which the parties
> bargained is unwarranted"; (2) a court may consider arguments
> about public-interest factors only; arguments about the parties'
> private interests should not be considered; and (3) "when a party
> bound by a forum-selection clause flouts its contractual obligation
> and files suit in a different forum, a § 1404(a) transfer of venue will
> not carry with it the original venue's choice-of-law rules."

*Id.* (quoting *Atl. Marine Const. Co.*, 571 U.S. at 63-64).  Therefore, the Court must first determine

whether Meta's forum-selection clauses are valid and enforceable.

Here, the forum-selection clauses state as follows:

> You and Meta each agree that any claim, cause of action, or dispute
> between us that arises out of or relates to these Terms or your
> access or use of the Meta Products shall be resolved exclusively in
> the U.S. District Court for the Northern District of California or a
> state court located in San Mateo County. . . .
>
> For any claim that is not arbitrated or resolved in small claims
> court, you agree that it will be resolved exclusively in the U.S.
> District Court for the Northern District of California or a state court
> located in San Mateo County.  You agree to submit to the personal
> jurisdiction of either of these courts for the purpose of litigating any
> such claim.

Dkt. No. 17-16 at 10; Dkt. No. 17-21 at 7.

### 1.  *Validity and Enforceability*

Plaintiffs argue Meta has not submitted admissible evidence sufficient to establish that

they assented to the relevant Terms.  *See* Dkt. No. 21-9 at 21-22.  Plaintiffs contend that even if

the Court considers the evidence, Meta has failed to prove that Plaintiffs assented to clear and

conspicuous contract terms.  *See id.* at 23-24.  Plaintiffs also argue that any update notices do not

bind users and that Meta has not produced evidence that Plaintiffs received and assented to update

notices.  *See id.* at 26-27.  They also contend that the Terms do not apply to the case at hand.  *See*

*id.* at 28.  Specifically, Plaintiffs state that their cause of action does not relate to their use of

Facebook or Instagram.  *See id.* at 28-31.  Finally, Plaintiffs argue that the forum selection clauses do not bind JSL because JSL and CFC are separate corporations.  *See id.* at 32.

Meta argues that its forum selection clauses are valid and enforceable and were clearly communicated to CFC in its Terms.  *See* Dkt. No. 22 at 16-18.  It also contends that "CFC creating both accounts constitutes clear and unambiguous assent to the Terms and forum-selection clauses."  *Id.* at 18.  Meta asserts that the clauses' language covers the scope of Plaintiffs' suit.  *See id.* at 18-20.  Finally, Meta argues that the clauses apply to JSL because of its licensing relationship with CFC.  *See id.* at 20.

In support of its motion, Meta submits the declaration of Nicholas Wong, Meta's eDiscovery and Litigation Case Manager.  *See* Dkt. No. 17-2.   In his declaration, Mr. Wong attests that the Car-Freshner Facebook account was registered on April 7, 2015, and that upon registration, the person creating the account would have been prompted, "By clicking Sign Up, you agree to our Terms and that you have read our Data Policy, including our Cookie Use."  *Id.* at ¶¶ 31, 33-34.  Mr. Wong states that on April 9, 2015, Car-Freshner obtained the Car-Freshner Facebook Page, and it would have had to agree to "Facebook Pages Terms."  *Id.* at ¶ 37-38.  Meta updated its Terms numerous times and Mr. Wong attests that it "affirmatively notifies its users of changes in the Terms over time, including through such methods as Facebook Newsroom announcements or in-application notifications."  *Id.* at ¶ 55.  As to Instagram, Mr. Wong declares that Car-Freshner created an account on December 30, 2019, and that "[b]y signing up, you agree to our Terms, Data Policy, and Cookies Policy."  *Id.* at ¶¶ 61, 64.  He contends that the Terms were available on the website and users were notified of updates via e-mail.  *See id.* at ¶¶ 69-70.

Plaintiffs argue that Mr. Wong's declaration constitutes inadmissible hearsay.  *See* Dkt. No. 21-9 at 21-22.  Meta argues that Mr. Wong's declaration is non-hearsay or, alternatively, falls

under a hearsay exception.  *See* Dkt. No. 22 at 15.  Meta does not identify a specific hearsay exception.  *See id.*

"This Circuit does not provide clear guidance on whether or not the Federal Rules of Evidence apply to a motion to transfer venue.  At least some federal courts have determined that the Rules of Evidence should apply."  *Corbishley v. Napolitano*, No. 20-CV-7445, 2020 WL 6157103, *3, n.3 (S.D.N.Y. Oct. 21, 2020) (collecting cases); *but see Aspen Speciality Ins. Co. v. RCI Hosp. Hodlings, Inc.*, No. 20-CV-4308, 2023 WL 4080550, *3 (S.D.N.Y. June 20, 2023) (collecting cases) ("In deciding whether [the clear and convincing] standard [for a motion to transfer] has been met, courts in the Second Circuit consider all materials they find compelling and do not restrict their evaluations only to materials that would satisfy the admissibility requirements of the Federal Rules of Evidence").

The Second Circuit has stated that "in evaluating a motion to dismiss based on a forum selection clause, a district court typically relies on pleadings and affidavits, but must conduct an evidentiary hearing to resolve disputed factual questions in favor of the defendant[.]"  *Martinez v. Bloomberg LP*, 740 F.3d 211, 216-17 (2d Cir. 2014) (citations omitted); *see also Hamm v. Capsule Corp.*, No. 22-CV-05435, 2022 WL 4468028, *5 (S.D.N.Y. Sept. 26, 2022) (citation omitted) (noting that "while a party may defeat summary judgment by demonstrating 'that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence,' that is different from requiring parties to submit evidence at this stage in the precise form it would be presented in at trial").  Federal Rule of Civil Procedure 56(c)(4) addresses specifically "affidavits or declarations" which are submitted in support of a motion for summary judgment, and states that such affidavits or declarations "must be made on personal knowledge, *set out facts that would be admissible in evidence*, and show that the affiant or declarant is

competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4) (emphasis added); *cf. Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 693, n.4 (E.D. Va. 2020) (collecting cases) ("Rule 56(c)(4) acts as the standard bearer for affidavits even outside the motion for summary judgment context. Indeed, courts routinely cite Rule 56(c)(4) and case law explaining the Rule 56(c)(4) standard in cases involving motions to transfer and motions to compel arbitration").  However, given the Second Circuit's guidance in *Martinez*, the Court will consider Mr. Wong's affidavit and accompanying exhibits when determining whether to transfer the case.  *See Martinez*, 740 F.3d at 216-17.

"Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006).

> To determine whether a forum selection clause is enforceable, courts ask:
>
> "(1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, i.e., whether the parties are required to bring any dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause."

*CleanSpark, Inc. v. Discover Growth Fund, LLC*, 485 F. Supp. 3d 494, 501 (S.D.N.Y. 2020) (quoting *Martinez*, 740 F.3d at 217).  "If the forum selection clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable."  *Id.* (citation omitted).  "A party can overcome this presumption only by (4) making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."  *Id.* (citation omitted).

The parties do not address whether the forum-selection clauses are mandatory or permissive.  *See generally* Dkt. Nos. 17-1, 21-9, 22.  They disagree as to whether the clauses were

reasonably communicated to CFC, whether the clauses pertain to Plaintiffs' claims, and whether JSL is bound by the clauses.  *See* Dkt. No. 17-1 at 21-22; Dkt No. 21-9 at 27-32; Dkt. No. 22 at 16-20.

In the context of reviewing the validity and enforceability of an arbitration clause, the Second Circuit has first looked to basic principles of contract creation.  The Second Circuit explained, "[i]t is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'  The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (citations omitted).  "Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Id.* at 289 (citations omitted).  The Second Circuit has "appl[ied] these same contract law principles to online transactions." *Id.* (collecting cases).[4]

---

[4] "[W]here a contract contains both a valid choice-of-law clause and a forum selection clause, the substantive law identified in the choice-of-law clause governs the interpretation of the forum selection clause, while federal law governs the enforceability of the forum selection clause[.]" *Martinez v. Bloomberg LP*, 740 F.3d 211, 214 (2d Cir. 2014); *see also CICI Bank Ltd. v. Essar Glob. Fund Ltd.*, 565 B.R. 241, 251-52 (S.D.N.Y. 2017) (citation omitted) (explaining that in answering whether a clause has been "reasonably communicated" to a party, "'[courts] normally apply the body of law selected in an otherwise valid choice-of-law clause.'").  Meta's Terms contain a choice of law provision indicating that California law should apply to disputes. *See, e.g.*, Dkt. No. 17-10 at 4.  Plaintiffs do not argue that the choice of law provision is invalid but argue that New York law should apply. *See* Dkt. No. 21-9 at 24, n.4.  Meta does not advance any arguments concerning whether this Court should apply California or New York law. *See generally* Dkt. Nos. 17-1, 22.  However, the Court need not engage in an expansive choice of law analysis because "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (citation omitted).

"In the context of web-based contracts, [the Court] look[s] to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put [him or] her on inquiry notice of such terms." *Starke*, 913 F.3d at 289. What is "important[t]" is "clearly signaling to the consumer in some fashion that, by continuing with the transaction or by using a website, [he or] she will be agreeing to the terms contained in an accompanying hyperlink." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 837 (2d Cir. 2021). In essence, "a party must be given some opportunity to reject or assent to proposed terms and conditions prior to forming a contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 430 (2d Cir. 2004). "So long as the purchaser's attention is adequately directed to a conspicuous hyperlink that is clearly identified as containing contractual terms to which the customer manifests assent by completing the transaction or retaining the product or service, a hyperlink can be an effective device for specifying contract terms." *Starke*, 913 F.3d at 296. Assent could also be possible through "repeated exposure to the terms and conditions . . . ." *Register.com, Inc.*, 356 F.3d at 431.

As explained in *Soliman*, in *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 72 (2d Cir. 2017), the Second Circuit held "that the user had agreed to hyperlinked terms and conditions" because (1) "the payment screen was uncluttered, with relatively few fields and only one external link"; (2) "the text including hyperlinks to the relevant documents appeared directly below the registration button"; (3) "the user did not need to scroll to see the links to the relevant documents"; (4) "the text including hyperlinks to the relevant documents was 'temporally coupled' with the registration button"; (5) "the language '[b]y creating an Uber account, you agree' was a 'clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms'"; and (6) "once the user

clicked the hyperlink and accessed the terms of service, 'the section heading ("Dispute Resolution") and the sentence waiving the user's right to a jury trial on relevant claims are both bolded.'" *Soliman*, 999 F.3d at 841 (citing *Meyer*, 868 F.3d at 78-79).  "Accordingly, [the Second Circuit] held that, '[a]lthough the contract terms are lengthy and must be reached by a hyperlink, the instructions are clear and reasonably conspicuous,' such that a reasonably prudent user would be on inquiry notice of the terms of service.'" *Id.* (quoting *Meyer*, 868 F.3d at 79).

Here, Meta contends that it reasonably communicated the forum-selection clauses to CFC because "on April 7, 2015, the person creating the account necessarily agreed to the Facebook terms."  Dkt. No. 17-2 at ¶ 34.  Mr. Wong provides a screenshot of "[t]he Facebook registration page as of April 7, 2015, which states, "'By clicking Sign Up, you agree to our Terms and that you have read our Data Policy, including our Cookie Use.'"  *Id.* at ¶ 33.  "The word 'Terms' was set apart with a distinct blue color and contained a hyperlink to the Facebook Terms in effect at the time, as reflected in the below screenshot."  *Id.*  The relevant clause was provided under the "Disputes" header of the Terms.  *Id.* at ¶ 36.  Mr. Wong attaches the Terms and the updated versions from 2015 to 2022 to his declaration.  *See* Dkt. Nos. 17-8-17-21.  Meta does not provide a screenshot of what a user would see if they were to click on the "Terms" hyperlink.  There also does not appear to be a table of contents on the web page that includes the Terms, or any indication of what information would be included in the Terms; rather, a user must scroll through all of the Terms to become aware of the "Dispute" section, including the forum-selection clause. *See, e.g.*, Dkt. No. 17-8 at 2; Dkt. No. 17-14 at 2; Dkt. No. 17-21 at 2.

As for Instagram, on its registration page as of December 30, 2019, there were two options: (1) a user could "Log in with Facebook" or (2) enter an e-mail or phone number, full name, username, and password to sign up for a new account.  *See* Dkt. No. 17-2 at ¶ 64.  The

following phrase was placed below the "sign up" button: "By signing up, you agree to our Terms, Data Policy, and Cookies Policy." *Id.* There was no change in font size or color to any part of the phrase, and there were no hyperlinks. *See id.*

Plaintiffs argue that they did not assent to the Terms nor were the Terms reasonably communicated because (1) CFC created its Facebook account in 2010; (2) Mr. Wong's declaration and images date back only to 2015; (3) Mr. Wong does not provide any information about whether the Instagram page was created by signing in with Facebook or registering for a new account; (4) the update banner notifications did not require a user's assent; (5) there is no evidence that CFC received any e-mails from Meta; and (6) the forum-selection clauses are "buried in the 'Terms'." *See* Dkt. No. 21-9 at 27-28.

To support enforcement of the clauses, Meta relies heavily on cases which have concluded that Facebook and Instagram's forum-selection clauses are valid and enforceable. *See* Dkt. No. 22 at 16-17. However, on the present record, the Court cannot conclude as a matter of law that CFC assented to reasonably communicated forum-selection clauses.

In favor of concluding that the forum-selection clauses were reasonably communicated, Meta included a short and straight-forward statement that "[b]y clicking Sign Up, you agree to our Terms and that you have read our Data Policy, including our Cookie Use." which included blue a hyperlink for the word "Terms." Dkt. No. 17-2 at ¶ 33. Instagram also included a similar statement under the "sign up" button. *Id.* at ¶ 64.

However, Ms. Waite-Holland declares that the Facebook account was created in 2010, and she provides a screenshot of the "About" page confirming as such. *See* Dkt. No. 21-1 at ¶ 26; Dkt. No. 21-8 at 3. Meta has not provided any evidence of what the Facebook registration page looked like in 2010, whether it contained hyperlinks to the Terms, and what the Terms contained.

In its footnote in its reply memorandum, Meta asserts "[a]lthough the location information page was created on August 18, 2010 as the Wong declaration explains, CFC could not claim the page until after it created a Facebook account." Dkt. No. 22 at 15, n.4 (citations omitted).  Mr. Wong's declaration does not contain any facts prior to April 7, 2015.  *See generally* Dkt. No. 17-2.  He attests, "[a]ccording to Facebook records, the person who created the Car-Freshner Facebook account first registered on Facebook on April 7, 2015." *Id.* at ¶ 31.  Mr. Wong does not reference or provide an exhibit which shows that the account was created in 2015.  *See id.*  Mr. Wong provides screenshots of CFC's Facebook page which shows that CFC made its first post on May 19, 2015.  *See* Dkt. No. 17-7 at 50.  Mr. Wong then declares that "[b]ecause the person who created the Car-Freshner Facebook Page created a Facebook account on April 7, 2015, the person creating the account necessarily agreed to the Facebook terms." *Id.* at ¶ 34.  Then, "[o]n April 9, 2015, Car-Freshner claimed the Car-Freshner Facebook Page, which had previously operated as a location information page." *Id.* at ¶ 37.  Contrary to Meta's assertion, Mr. Wong does not explain when CFC's location page was created, how that differs from an account, and whether CFC would have had to assent to the Terms upon creation of a location page.  *See* Dkt. No. 22 at 15, n.4.  Without such evidence, the Court cannot conclude that CFC assented to the Terms when it created its Facebook account.

Similarly, Instagram's Terms were not hyperlinked, and Meta does not provide any evidence concerning whether CFC signed in with Facebook or signed up with a new account.  Meta does not explain what would have appeared to the user if CFC signed in with an already existing Facebook account.  This is insufficient to establish as a matter of law that CFC or JSL assented to and were made reasonably aware of Instagram's forum-selection clause.

Meta argues that even if CFC did not assent to the Terms upon creation of its accounts, it assented through notification of the updated Terms.  *See* Dkt. No. 22 at 18, n.10.  However, as Plaintiffs state, there is no evidence that CFC received any e-mails with the updated Terms or evidence that they were required to asset to the notification banners on the website.  *See* Dkt. No. 21-9 at 26-27.

The screenshots of the update notification banners state, "[w]e want you to feel confident in managing your privacy.  That's why we updated our Privacy Policy and Terms of Service to provide more details about how we use your information.  Review the updates that go into effect on July 26, 2022 if you accept."  Dkt. No. 17-2 at ¶ 57.   Meta does not argue or present evidence that CFC "accept[ed]."  *Id.*  Another notification instructed the user to "[l]earn more about the updates that go into effect on July 26, 2022."  *Id.*  The notifications included two buttons: "Don't show again" and "Learn More."  *Id.*  There is no indication in either of the banners that the updates would relate to anything other than privacy issues and Meta does not present evidence that CFC reviewed the Terms or "accept[ed]" them.  *Id.*

The Second Circuit has distinguished situations where a user is repeatedly notified of the relevant terms and admits to being aware of them from a situation where a user would not necessarily have seen the terms.  *See Register.com, Inc.*, 356 F.3d at 396 (citing *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002)).  In *Specht*, the Second Circuit "ruled against [the defendant] and in favor of the users of its software because the users would not have seen the terms . . . without scrolling down their computer screens, and there was no reason for them to do so."  *Register.com, Inc.*, 356 F.3d at 402.  "The evidence did not demonstrate that one who had downloaded [the] software had necessarily seen the terms of its offer."  *Id.*  In

*Register.com*, the challenging party "admitted that . . . it was fully aware of the terms . . ." by accessing and using the software every single day. *Id.*

Here, Plaintiffs do not admit that they were fully aware of the Terms. There is conflicting evidence about when CFC created its Facebook account, and there is no evidence of the Terms from 2010 and whether CFC had to assent to the Terms to register its account. There is also no evidence that CFC received an e-mail containing the updated Terms. Although Meta contends that it posted its term updates on users' Facebook pages, there is no indication that those terms related to anything other than privacy concerns. *See* Dkt. No. 17-2 at ¶ 57. As the record stands, this case resembles *Specht* more than *Register.com*. For Plaintiffs to have been aware of the forum-selection agreement, they would have to click on the "Review now" or "Learn more" buttons on the update notices and scroll through all of the Terms until it came upon the "dispute" section. *Id.* Although the Second Circuit has stated that "[w]hile it may be the case that many users will not bother reading the additional terms, that is the choice the user makes[,]" there is insufficient evidence to support a conclusion as a matter of law that Plaintiffs were on inquiry notice of the forum-selection provision. *Meyer*, 868 F.3d at 71. Meta's argument that it notified users of updates in its Terms is also insufficient to bind CFC to the forum selection clause. Thus, the Court concludes that Plaintiffs did not assent to reasonably communicated terms and the Court will not enforce the forum-selection clauses.[5]

---

[5] The Court need not address the parties' disputes about whether the claims in Plaintiffs' amended complaint are encompassed by the forum-selection clauses or whether JSL is subject to the clauses because it cannot conclude as a matter of law that the clauses were reasonably communicated to Plaintiffs. *See Gasland Petroleum, Inc. v. Firestream Worldwide, Inc.*, No. 1:14-CV-597, 2015 WL 2074501, *3 (N.D.N.Y. May 4, 2015) (quoting L*ongo v. FlightSafety Int'l, Inc.*, 1 F. Supp. 3d 63, 67 (E.D.N.Y. 2014)) ("'[B]ecause the plaintiff risks losing its chosen forum by enforcement of the forum-selection clause, the plaintiff is entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party' absent an evidentiary hearing").

### 2. *Transfer*

The parties address whether the public interest favors transferring the case to California. *See* Dkt. No. 17-1 at 23; Dkt. No. 21-9 at 33; Dkt. No. 22 at 21.  This is one of the primary factors that the Court must consider when there is "[t]he presence of a valid forum-selection clause . . . ." *Commander*, 389 F. Supp. 3d at 188.  However, because the Court concludes that the forum-selection clause cannot be enforced since there is not enough evidence to conclude that the Terms were reasonably communicated to Plaintiffs, the Court must turn to the traditional § 1404(a) factors to determine whether transfer is appropriate.  *See O'Brien v. Okemo Mountain, Inc.*, 17 F. Supp. 2d 98, 103-04 (D. Conn. 1998) (considering traditional § 1404 transfer factors after concluding that the forum selection clause was unenforceable as it was not reasonably communicated to the plaintiff); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 368-69 (E.D.N.Y. 2009), *aff'd*, 380 Fed. Appx. 22 (2d Cir. 2010) (same).

This analysis requires the Court to engage in a two-part inquiry.  First, the Court asks whether the action could have been brought in the proposed transferee forum.  *See* 28 U.S.C. § 1404(a).  Second, the Court considers the seven factors outlined above.  *See Orden v. Cornell Univ.*, 243 F. Supp. 3d 287, 292-93 (N.D.N.Y. 2017) (citation omitted).

Plaintiff does not contest that the complaint could have been brought in the Northern District of California as Meta is headquartered in Menlo Park, California.  *See* Dkt. No. 17-1 at 20; Dkt. No. 13 at ¶ 23; *see generally* Dkt. No. 21-9; *see also Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*, 260 F. Supp. 3d 401, 409 (S.D.N.Y. 2017) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).

As to the § 1404 factors, Plaintiffs chose the Northern District of New York and CFC has its principal place of business here.  *See* Dkt. No. 13 at ¶ 11.  Neither party explains where the relevant documents or witnesses are located.  *See* Dkt. Nos. 17-1, 21-9, 22.  However, Plaintiffs allege that the infringing product was shipped to an address located in the Northern District of New York.  *See* Dkt. No. 13 at ¶ 105.  Neither party explains their relative means, but both are corporate entities.  It is likely that both parties have some means by which they could travel to the opposing party's desired venue.  Plaintiffs state that Meta's 2022 revenue was $116 billion.  *See* Dkt. No. 21-9 at 17.  Assuming the truthfulness of the statement, it is likely that Meta maintains the means to communicate with and travel to the Northern District of New York.

As to the availability of the Court to compel unwilling participants, Federal Rule of Civil Procedure 45(c) limits service of a subpoena to command a person to attend trial, hearing, or deposition to "within 100 miles of where the person resides, is employed, or regularly transacts business in person or; (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense."  FED. R. CIV. P. 45(c)(1).  A subpoena for the "production of documents, electronically stored information, or tangible things at a place" is limited to "within 100 miles of where the person resides, is employed, or regularly transacts business in person[.]"  FED. R. CIV. P. 45(c)(2)(A).  Although Meta is headquartered in California, Plaintiffs contend that it "maintains a substantial corporate office and thousands of employees in" New York.  Dkt. No. 13 at ¶ 14.  Neither party provides specific information as to where the corporate office is, or where the employees are located.  *See id.*  Therefore, the Court cannot determine the likelihood of whether subpoenas could be issued for relevant documents or witnesses.  *See In re Hanger Orthopedic Grp., Inc. Sec. Litig.*, 418 F. Supp. 2d 164, 169

(E.D.N.Y. 2006) (noting that the service factor was "neutral" as to transfer because "plaintiffs plan to call non-party witnesses from New York and defendants plan to call non-party witnesses from Maryland; neither would be subject to process in the other forum.").

Based on the arguments and information presently before the Court, convenience weighs in favor of maintaining the case in the Northern District of New York as Plaintiffs chose this venue, CFC maintains its principal place of business here, Meta allegedly maintains a corporate office and employees somewhere in New York, the allegedly infringing product was shipped to New York, and Meta does not argue that it lacks the means necessary to engage with this Court. Thus, the Court denies Meta's motion to transfer.

**D.    Motion to Dismiss for Failure to State a Claim**

Meta argues that Plaintiffs complaint fails to state a claim for direct liability, contributory liability, counterfeiting, and dilution.  *See* Dkt. No. 17-1 at 23-33.

### *1. Direct Liability*

"Under section 32 [of the Lanham Act], 'the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent.'"  *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 145-46 (2d Cir. 2007)).  A mark is deemed "on goods" and "in use in commerce" when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale" and "the goods are sold or transported in commerce[.]"  15 U.S.C. § 1127. Such a claim is analyzed "under a familiar two-prong test.  The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is

likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.'"

*Tiffany*, 600 F.3d at 102 (quoting *Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004)).

Meta does not contest that Plaintiffs own a mark that is entitled to protection.  *See*

*generally* Dkt. Nos. 17-1, 22.  Meta argues that it did not "place" the marks on the allegedly

infringing products and therefore cannot be directly liable.  Dkt. No. 17-1 at 23-24.  Meta relies,

in part, on *Lopez v. Bonanza.com, Inc.*, No. 17-CV-8493, 2019 WL 5199431 (S.D.N.Y. Sept. 30,

2019).  *See id.* at 24.

In *Lopez*, the plaintiff sued Microsoft, Hostway, GoDaddy, Poshmark, and Pixels for

providing the web hosting and online retail services to various third-party websites which sold

allegedly infringing products.  *Lopez*, 2019 WL 5199431, at *8-9.  The court dismissed the direct

infringement claims because the "[p]laintiff [] does not contend that the Online Platform 12(b)(6)

Moving Defendants 'sold [their] services by use of' [the p]laintiff's marks or that they 'used the

mark[s] in connection with selling or advertising [their] web hosting[, e-commerce, or online]

services.'"  *Id.* at *10.  Rather, it was the third parties who were using the websites to sell items

with the plaintiff's trademarks.  *See id.*

Plaintiffs attempt to distinguish *Lopez* by arguing that Meta made "active efforts . . . to

place the Infringing Products bearing the infringing marks on its webpages" by (1) listing other

items in and around Watertown, New York, on its "Today's picks" page and (2) including an

image of the allegedly infringing product on the checkout page.  Dkt. No. 21-9 at 34; *see also*

Dkt. No. 13 at ¶¶ 88, 97, 100.  Plaintiffs do not allege that Meta included any allegedly infringing

products on its "Today's picks" page and, as in *Lopez*, it is a third party who used Meta's websites

to sell the allegedly infringing product.  *See Lopez*, 2019 WL 5199431, at *10.  Meta did not

"place" any of Plaintiffs' Marks on "the goods."  15 U.S.C. § 1127.

In *Tiffany*, the Second Circuit concluded that eBay did not directly infringe on Tiffany's trademark where it resold genuine Tiffany goods. *Tiffany*, 600 F.3d at 103. Tiffany argued that some of the goods being sold on eBay were counterfeit, which the Second Circuit explained "is not a basis for a claim of direct trademark infringement against eBay, especially inasmuch as it is undisputed that eBay promptly removed all listings that Tiffany challenged as counterfeit and took affirmative steps to identify and remove illegitimate Tiffany goods." *Id.* The Second Circuit continued, "[t]o impose liability because eBay cannot guarantee the genuineness of all of the purported Tiffany products offered on its website would unduly inhibit the lawful resale of genuine Tiffany goods." *Id.*

Although Plaintiffs allege that Meta did not promptly remove the infringing products from its websites, there are no allegations that Meta "placed" the infringing marks on any goods. 15 U.S.C. § 1127(1)(A); *see also Lops v. YouTube, LLC*, No. 3:22-CV-843, 2023 WL 2349597, *3 (D. Conn. Mar. 3, 2023) (footnote omitted) ("[T]he exhibits indicate that the videos were created or posted by third parties rather than by YouTube. But YouTube cannot be subject to direct liability for trademark infringement based on videos uploaded by third parties"); *Nike, Inc. v. B&H Customs Servs., Inc.*, 565 F. Supp. 3d 498, 508 (S.D.N.Y. 2021) ("[T]he infringer must have some intention to sell, advertise, or distribute the infringing product or service in order for strict liability to attach. Mere unwitting transportation of another's goods is not enough . . . "). As such, the Court grants Meta's motion and dismisses the direct liability claims.

### 2. Contributory Liability

"The Lanham Act does not expressly create liability for contributory trademark infringement, but the Supreme Court has concluded that 'liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another.'" *Omega SA v. 375*

*Canal, LLC*, 984 F.3d 244, 254, n.11 (2d Cir. 2021) (quoting *Inwood Labs., Inc. v. Ives Labs.*, Inc., 456 U.S. 844, 853 ((1982)).  "[W]here a defendant knows or should know of infringement, whether that defendant may be liable for contributory infringement turns on what the defendant does next." *Id.* at 255.  "If it undertakes bona fide efforts to root out infringement . . . that will support a verdict finding no liability, even if the defendant was not fully successful in stopping infringement.  But if the defendant decides to take no or little action, it will support a verdict finding liability." *Id.*

Plaintiffs allege that it submitted four trademark reports, two to Facebook and two to Instagram, alerting Meta to the allegedly infringing products and asking for the products to be removed from the respective websites.  *See* Dkt. No. 13 at ¶¶ 113, 116, 118, 123.  Plaintiffs claim that Meta "explicitly refus[ed]" to remove the allegedly infringing products.  *Id.* at ¶¶ 114, 117, 119, 121, 124.

Meta provides the e-mail communications between Facebook, Instagram, and Ms. Waite-Holland.  *See* Dkt. Nos. 17-3-17-6.  In each of the responses to Ms. Waite-Holland's reports, Facebook and Instagram stated that they could not conclude that the identified content infringed on Plaintiffs' trademarks, and they provided hyperlinks to additional information concerning intellectual property rights and infringement.  *See id.*  Meta argues that it cannot be contributorily liable because "Meta responded to the notices by raising issues to which CFC did not substantively or effectively respond" and "Meta removed the allegedly infringing materials upon receipt of the original Complaint."  Dkt. No. 17-1 at 25.  Meta claims that it raised issues with Plaintiffs, including "nominative fair use," "commentary," and "the un-likelihood of confusion based on the appearance of the marks in the actual marketplace, as they will be encountered by consumers." *Id.* at 26.

At the motion to dismiss stage, the Court is required to accept Plaintiffs' allegations as true. *See ATSI Commc'ns, Inc.*, 493 F.3d at 93.  Plaintiffs' amended complaint alleges that they submitted four trademark reports "supplying specific information concerning JSL and its trademarks, and explaining the infringement."  Dkt. No. 13 at ¶¶ 113, 116, 118, 123.  Plaintiffs contend that Facebook and Instagram "explicitly refus[ed] to take down the post[s] . . . ." *Id.* at ¶¶ 114, 117, 119, 121.  Plaintiffs "resubmitted evidence of JSL's U.S. Federal Trademark Registration[s]" but Facebook and Instagram refused to take down the posts or "ceased to respond." *Id.* at ¶¶ 120, 122, 125, 127.  Plaintiffs allege that Facebook was "on express notice of Plaintiffs' rights in the Tree Design Marks" because "[o]n February 26, 2008, Plaintiffs' representatives contacted Facebook concerning th[e] unauthorized use [of their Marks], and Facebook then removed the unauthorized use, both from its Facebook's Gifts page and from its members' profile pages." *Id.* at ¶ 129.  This is sufficient to state a contributory infringement claim.

Meta states that Plaintiffs failed to respond to its emails, but Meta does not present any authority to support that Plaintiffs were required to do so to state a contributory infringement claim. *See* Dkt. No. 17-1 at 25-26.  Further, Plaintiffs allege that they did respond to Meta by supplying their trademark registration numbers. *See* Dkt. No. 13 at ¶¶ 120, 122, 125, 127. Additionally, Facebook and Instagram's responses to Plaintiffs stated only that they did not see how the identified products would be confusing to consumers. *See* Dkt. No. 17-3 at 3; Dkt. No. 17-4 at 2; Dkt. No. 17-6 at 2.  There does not appear to be a communication whereby Meta asked Plaintiffs to respond about "nominative fair use," "commentary," or to "respond" about the "confusion."  Dkt. No. 17-1 at 26.  Insofar as Meta contends that it removed the products after receiving Plaintiffs' original complaint, Meta does not explain how that negates its liability during

the period from when Plaintiffs originally contacted Facebook and Instagram in October 2022, until the time Plaintiffs served the initial complaint in December 2022. *See Car-Freshner Corp. v. Getty Images, Inc.*, 822 F. Supp. 2d 167, 180 (N.D.N.Y. 2011) (denying motion to dismiss contributory infringement claim where the plaintiff's, Car-Freshner Corp., "alleged facts plausibly suggesting that (1) [d]efendants' customers, through commercial use of images licensed from Defendants containing the Tree Marks, have infringed on [p]laintiffs' Tree Marks, and (2) [d]efendants induced this infringement by offering licensing rights to images containing [p]laintiffs' Tree Marks, despite knowing that the images constituted infringement").

The Second Circuit recently affirmed dismissal of a contributory infringement claim against YouTube. *See Bus. Casual Holdings, LLC, v. YouTube, LLC, et al.*, No. 22-CV-3007, 2023 WL 6842449, *2 (2d Cir. Oct. 17, 2023). In *Business Casual Holdings*, the plaintiff alleged "that YouTube is liable for contributory copyright infringement because it removed the three infringing videos rather than terminating [the infringing third-party's] entire YouTube account including all associated [] channels." *Id.* The amended complaint alleged that the plaintiff submitted takedown notices to YouTube concerning the allegedly infringing videos. *See Bus. Casual Holdings, LLC v. YouTube, LLC*, No. 21-CV-3610, 2022 WL 17177970, *2 (S.D.N.Y. Nov. 22, 2022). "[A]s alleged in both the Original Complaint and the Amended Complaint, YouTube removed the First [] Video nine days after it received Business Casual's [notice]; the Second [] Video twenty-three days after it received Business Casual's [notice]; and the Third [] Video three days after it received Business Casual's [notice]." *Id.* The amended complaint alleged that within the one-month period between the second takedown notice and YouTube's removal of the second video, "YouTube requested and Business Casual provided certain details pertaining to YouTube's concern that the Second RT Video might qualify as 'fair use.'" *Id.*

45

(citation omitted).  The district court emphasized YouTube's "prompt[]" removal of the videos in determining that the plaintiff failed to allege contributory or vicarious infringement.  *Id.* at *6-7.  The court also rejected the plaintiff's "suggest[ion] that the . . . 23-day period renders YouTube secondarily liable for TV-Novosti's infringement[.]"  *Id.* at *7.  That was because the plaintiff did not point "'to any authority' suggesting that YouTube was obligated to investigate Business Casual's complaint on 'a more compressed timeline.'"  *Id.* (citation omitted).  The court also noted that "the new allegations in the Amended Complaint indicate that YouTube spent the 23-day period actively communicating with Business Casual and evaluating the alleged infringement, foreclosing any inference that YouTube simply sat back and allowed the alleged infringement to occur."  *Id.* (citations omitted).  The Second Circuit "agree[d] with the district court that, 'because YouTube promptly and permanently removed the First, Second, and Third RT Videos from its platform once it received the plaintiff's DMCA notices, the Amended Complaint does not permit an inference that YouTube acted in concert with TV-Novosti.'"  *Bus. Casual Holdings*, 2023 WL 6842449, at *2 (citation omitted).

"'An allegation that a defendant 'merely provid[ed] the means to accomplish an infringing activity' is insufficient to establish a claim for contributory infringement.'"  *Ranieri v. Adirondack Dev. Grp., LLC*, 164 F. Supp. 3d 305, 347 (N.D.N.Y. 2016) (quoting *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012)).  "Rather, participation in the infringement must be 'substantial' and the authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer."  *Id.* (citations and additional quotation marks omitted).  "Thus, one who furnishes a copyrighted work to another but is innocent of any knowledge of the other party's intended illegitimate use will not be liable."  *Id.* (citation and quotation marks omitted); *see also*

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 797 (9th Cir. 2007) (citation and quotation marks omitted) (concluding that a website, such as Google or Amazon, can be said to materially contribute to infringement if the company "assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials").

Plaintiffs' allegations are different from those in *Business Casual Holdings* because Plaintiffs allege that Meta did not remove the infringing post or products from Facebook or Instagram until Plaintiffs filed their original complaint with this Court. *See* Dkt. No. 13 at ¶¶ 114-15, 117, 119, 121. Plaintiffs allege that even after they notified Facebook and Instagram of the alleged infringement, both websites advertised and offered the infringing products. *See id.* at ¶¶ 110. Accepting Plaintiffs' allegations as true, they have sufficiently stated a contribution claim as they allege that Meta had knowledge of the alleged infringement and instead of removing the posts or products from its websites, it continued to advertise the products. Thus, the Court denies Meta's motion to dismiss.

### 3. *Counterfeiting*

Meta seeks dismissal of Plaintiffs' counterfeiting claims because the allegedly infringing products are not "substantially indistinguishable" from Plaintiffs' Marks. Dkt. No. 17-1 at 27-28.

"Under the Lanham Act, [a] counterfeit is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 (2d Cir. 2020) (citation and quotation marks omitted); *see also* 15 U.S.C. § 1127. "This test of 'identical with, or substantially indistinguishable from' requires a closer degree of similarity than is required for traditional trademark infringement or unfair competition." *Birmingham v. Mizuno USA, Inc.*, No. 5:09-CV-0566, 2011 WL 1299356, *8 (N.D.N.Y. Mar. 31, 2011) (additional quotation marks omitted) (quoting 4 J. Thomas McCarthy, McCarthy on

Trademarks and Unfair Competition § 25:10 (2005)).  "In addition, [t]he Second Circuit has stated that an allegedly counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser."  *Id.* (citation omitted) (alteration in original); *see also Colgate-Palmolive Co. v. J.M.D. All-Star Import and Export Inc.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 315 (2d Cir. 2013) (concluding that the plaintiff had failed to state a counterfeiting claim because "the font, color, and capitalization of [the plaintiff's] mark differed from the offending uses made by defendants").

Plaintiffs provide images of their Marks as well as the allegedly infringing products.  They appear as follows:

| Mark | Registration No. | Registration Date | Goods |
|---|---|---|---|
| | 719,498 | August 8, 1961 | Absorbent body impregnated with a perfumed air deodorant, in Class 5 |
| | 1,781,016 | July 13, 1993 | Air freshener, in Class 5 |
| | 1,791,233 | September 7, 1993 | Air freshener, in Class 5 |
| | 2,741,364 | July 29, 2003 | Travel bags, in Class 18; Shirts, sweatshirts, t-shirts and caps, in Class 25 |
| | 3,766,310 | March 30, 2010 | Air fresheners, in Class 5; pens and stickers, in Class 16; luggage tags, in Class 18; shirts and hats, in Class 25 |
| LITTLE TREES | 1,990,039 | July 30, 1996 | Air fresheners, in Class 5 |
| VANILLAROMA | 1,985,773 | July 6, 1996 | Air fresheners, in Class 5 |

Dkt. No. 13 at ¶ 31.

  

Id. at ¶ 81.



Id. at ¶ 83.

  

49

*Id.* at ¶ 108.  Plaintiffs use the Marks primarily on air fresheners, but also on other consumer goods including t-shirts and stickers.  *See id.* at ¶ 27.  The three allegedly infringing air fresheners were in the Tree Mark shape, one of the three included the name "Little Trees[,]" and the product listing stated "Vanillaroma."  *Id.* at ¶¶ 81, 83.  The other two air fresheners had a different name on them: "AirSanto."  *Id.* at ¶ 83.  The allegedly infringing sticker and t-shirt used the Tree Mark shape and included the phrase "Check Your Ego Amigo" and the brand name, "Dirty Goods."  *Id.* at ¶ 108.  Plaintiffs allege that the infringing air fresheners, t-shirt, and sticker are substantially indistinguishable from their Marks and are spurious.  *See id.* at ¶¶ 82, 109.

Meta claims that the addition of the "Air Santo," "Dirty Goods," and "Check Your Ego Amigo" to the stickers, t-shirts, and air fresheners make the Marks not spurious.  *See* Dkt. No. 17-1 at 18.  However, one of Plaintiffs' Marks is the Tree Design, which is the specific shape of the design used on all of the allegedly infringing products.  *See* Dkt. No. 13 at ¶¶ 31, 108.[6]

At this early stage, accepting Plaintiffs' allegations as true, they have sufficiently stated a counterfeiting claim as a consumer might be confused as to whether the infringing products, although containing different names and slogans, belong to Plaintiffs.  One of the infringing air fresheners uses both the Tree Design Mark and Little Trees Mark, without alteration.  *See id.* at ¶ 83.  All of the infringing products utilize the Tree Design Mark, without any apparent alteration. *See id.* at ¶¶ 83, 108.  As for the "Vanillaroma" Mark, Plaintiffs present a Facebook Marketplace listing which included an "Air Santo" air freshener that used the Tree Design Mark and stated "Vanillaroma" underneath.  *Id.* at ¶ 81.  The tree shape and "Vanillaroma" being used on an air freshener appears to be more than a "colorable imitation" as they are not altered in any way.

---

[6] Plaintiffs point out that in its pre-motion letter, Meta argued only that Plaintiffs failed to state a counterfeiting claim as to the t-shirts and not the air fresheners.  *See* Dkt. No. 21-9 at 40; *see also* Dkt. No. 10 at 3.

*Tiffany & Co.*, 971 F.3d at 95, n.17 (citation omitted).  Importantly, Plaintiffs' trademarks for the Tree Design Mark and "Little Trees" Mark are separate.  Therefore, the fact that "AirSanto" is included on some of the infringing air fresheners does not negate the fact that the Tree Design Mark is identical.  Dkt. No. 13 at ¶¶ 31, 83.  The fact that the goods are also goods sold by Plaintiffs—air fresheners, T-shirts, and stickers—supports a conclusion that Plaintiffs have stated a counterfeit claim sufficient to withstand a Rule 12(b)(6) motion.  *See Chrome Hearts LLC v. Controse Inc.*, No. 21-CV-6858, 2023 WL 5049198, *9-10 (S.D.N.Y. Aug. 8, 2023) (citations omitted) (explaining that "[t]he statute thus clearly delineates that the 'marks' are distinct from the 'goods' or 'product[s]' on which they are affixed" and "[n]othing in the Lanham Act requires that the standard of 'identical' or 'substantially indistinguishable' apply to the products or goods" . . . but "'[w]here the marks are identical, and the goods are also identical and directly competitive,' a conclusion of likelihood of confusion will follow").

Based on the foregoing, the Court denies Meta's motion to dismiss Plaintiffs' counterfeiting claims.  However, insofar as the Court allows Plaintiffs' counterfeit claims to proceed, it is only to the extent that Plaintiffs allege contributory liability by Meta and not direct liability for the reasons set forth above.

### 4.  *Dilution/Lanham Act*

"Under federal law, an owner of a famous, distinctive mark is entitled to an injunction against the user of a mark that is likely to cause dilution of the famous mark."  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009) (quotation marks omitted).  "A threshold question in a federal dilution claim is whether the mark at issue is 'famous.'"  *Legends Are Forever, Inc. v. Nike, Inc.*, 58 F. Supp. 3d 197, 210 (N.D.N.Y. 2014) (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012)) (additional quotation marks

omitted).  "A mark is famous if it 'is widely recognized by the general consuming public of the

United States as a designation of source of the goods or services of the mark's owner.'"  *Id.*

(quoting 15 U.S.C. § 1125(c)(2)(A)).

Meta argues that Plaintiffs fail to allege that the "Vanillaroma" and "Little Tree" Marks

are famous.  *See* Dkt. No. 17-1 at 28-33.

Plaintiffs respond that as to the "Vanillaroma" Mark, they do not plead a federal dilution

claim and instead plead only a state law dilution claim which does not require a mark to be

famous.  *See* Dkt. No. 21-9 at 41, n.13.  Meta does not contest this in its reply.  *See* Dkt. No. 22 at

26-27.  Plaintiffs also argue that their Tree Design Mark is famous, but Meta does not argue that

the Tree Design Mark is not famous.  *See* Dkt. No. 21-9 at 41-44.  Rather, Meta argues that "CFC

fails to sufficiently allege fame for either the Little Trees Marks or the Vanillaroma Marks[]" and

that "CFC's allegations all refer to multiple marks used concurrently on product, and thus fails

adequately to plead that any *single* mark is famous."  Dkt. No. 17-1 at 28, 30.  Meta continues,

"[i]f both Vanillaroma and the Little Trees design are present, it is not possible to assess the fame

of either alone, thus precluding any ability to assert the fame of any mark individually."  *Id.* at 30.

In 2020, the Second Circuit affirmed the district court's grant of summary judgment as to

CFC's federal trademark dilution claims for CFC's "Black Ice" and "Bayside Breeze" marks

"substantially for the reasons stated by the District Court in its opinion, *i.e.*, that 'no evidence

supports a finding that either of the marks in question are famous,' as required to claim dilution."

*Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 334 (2d Cir. 2020) (quoting *Car Freshner

Corp. v. Am. Covers, LLC*, 419 F. Supp. 3d 407, 448 (N.D.N.Y. 2019)).  In its 2019 decision, this

Court concluded that CFC's "Black Ice" and "Bayside Breeze" marks were not famous because

(1) "[p]laintiffs do not accuse [d]efendants of diluting the distinctive and (perhaps) famous 'Little

Trees' mark; they point to two specific fragrances[]"; (2) "[t]he amount of sales reported for Black Ice, which are at least several times those of the Bayside Breeze scent, are insufficient to serve as evidence of a mark that is nationally famous with the general consuming public[]"; and (3) "[t]he only evidence . . . that the consuming public recognizes the products is . . . that Black Ice has appeared in popular culture, particularly in the cars driven by actors in movies and music videos, and that the Bayside Breeze product appeared once on screen in an HBO program and on social media." *Car-Freshner Corp.*, 419 F. Supp. 3d at 447-48.

The 2019 case was resolved on summary judgment. *See Car Freshner Corp.*, 419 F. Supp. 3d at 421.  The standards for summary judgment and a Rule 12(b)(6) motion are different. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (citation omitted) ("It is important to recognize the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment.  At the 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test'").

As Plaintiffs state, the cases that Meta relies on to support dismissal were either resolved at the pleading stage, where less or no facts were pled concerning the famousness of the marks, or they were resolved on motions for summary judgment or for a preliminary injunction.  *See* Dkt. No. 21-9 at 44, n.15; *see also Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 251 (S.D.N.Y. 2016), *aff'd*, 699 Fed. Appx. 93 (2d Cir. 2017) (entering judgment after a five-day bench trial); *Luv N' Care, Ltd. v. Regent Baby Prod. Corp.*, 841 F. Supp. 2d 753, 757 (S.D.N.Y. 2012) (dismissing claims because "plaintiffs do not plead enough facts to support the assertion that their marks are similarly famous.  They plead no facts regarding their advertising and

publicity of the marks of the particular products in suit, nor do they plead that their marks are registered"); *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 903 (S.D. Tex. 2014) (denying preliminary injunction which requires a showing of "a substantial likelihood of success on the merits"); *Walker Wear LLC v. Off-White LLC*, 624 F. Supp. 3d 424, 430 (S.D.N.Y. 2022) (granting motion to dismiss because the plaintiff alleged "three films and three magazine features, in which Walker Wear designs were featured in some way" which "supports, at most, niche fame within the design or streetwear industry"); *Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 661 (W.D. Tex. 2008) (granting summary judgment motion); *Finn v. Dean Transp., Inc.*, 53 F. Supp. 3d 1043, 1044 (M.D. Tenn. 2014) (same).

Here, as Meta states, Plaintiffs rely on much of the same evidence that CFC did in 2019. *See* Dkt. No. 17-1 at 29-30; *see also* Dkt. No. 13 at ¶¶ 44-73; *Car-Freshner Corp.*, 419 F. Supp. 3d at 447-48. It appears far less likely that the "Vanillaroma" Mark is famous as compared to the "Little Tree" and Tree Design Marks. It appears that the "Vanillaroma" Mark might be subject to similar problems identified in the 2019 case concerning the "Black Ice" and "Baybreeze" marks. *See Car-Freshner Corp.*, 419 F. Supp. 3d at 447-48. However, whether Plaintiffs will be successful as a matter of law on a dilution claim with a full record is not for the Court to decide at this juncture. Rather, the inquiry is limited to reviewing "the legal sufficiency of the party's claim for relief and pleadings without considering the substantive merits of the case." *Brown v. New York*, 975 F. Supp. 2d 209, 228 (N.D.N.Y. 2013).

Plaintiffs allege that all three Marks "are promoted through a nationwide distribution network in which CFC and its predecessors have invested millions and millions of dollars." Dkt. No. 13 at ¶ 37. They contend that the Marks are sold at well-known retailers across the country

including, for example, Walmart, Target, Dollar Tree, Menards, Home Depot, Meijer, and Publix. *See id.* at ¶¶ 39-40. Plaintiffs state that the Marks are advertised by Target and Facebook, and are used in movies, television shows, music videos, news articles, and art installations. *See id.* at ¶¶ 42-73. Plaintiffs' allegations of the various uses of the Marks span 1977 to 2022. *See id.* at ¶¶ 45, 54.

Meta argues that (1) reference to "millions and millions of dollars" "is not enough"; (2) "coverage in national publications and film distributions are not enough"; and (3) Plaintiffs did not make any allegations about how many people saw or recognized their products. Dkt. No. 22 at 26-27. The Court agrees that none of Plaintiffs' allegations, standing alone, would be sufficient to plead that Plaintiffs' marks are famous. However, in combination, and accepting the allegations as true, Plaintiffs have sufficiently stated a dilution claim. Insofar as Plaintiffs have not presented a precise number of people who recognize their product, this deficiency could impact the merits of the dilution claim. *See Car Freshner Corp.*, 419 F. Supp. 3d at 447. At this stage, however, the allegations are sufficient to state that Plaintiffs' Marks are famous and Meta's motion to dismiss the dilution claims is denied.[7]

In a footnote in its reply memorandum, Meta states, "CFC fails to state a claim under New York's dilution statute for a different reason, namely the requirement that the marks at issue must be 'very' or 'substantially similar.'" Dkt. No. 22 at 27, n.16. Meta did not move to dismiss

---

[7] In a footnote in its reply memorandum, Meta states, "CFC fails to state a claim under New York's dilution statute for a different reason, namely the requirement that the marks at issue must be 'very' or 'substantially similar.'" Dkt. No. 22 at 27, n.16. Meta did not move to dismiss the state law dilution claims in its motion to dismiss. See generally Dkt. No. 17-1. It is well settled that the Court will not consider arguments raised for the first time in reply. *See Gonzales v. Agway Energy Servs., LLC*, No. 5:18-CV-235, 2019 WL 910669, *2 (N.D.N.Y. Feb. 25, 2019) (citing, *inter alia, ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007)).

the state law dilution claims in its motion to dismiss.  *See generally* Dkt. No. 17-1.  It is well

settled that the Court will not consider arguments raised for the first time in reply.  *See Gonzales*

*v. Agway Energy Servs., LLC*, No. 5:18-CV-235, 2019 WL 910669, *2 (N.D.N.Y. Feb. 25, 2019)

(citing, *inter alia*, *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100

n.16 (2d Cir. 2007)).

## E.  Motion to Amend

Plaintiffs seek leave to amend for any claims the Court finds deficient.  *See* Dkt. No. 21-9

at 44.  They seek to amend their claims "to 'demonstrate that their claims deserve to be heard on

the merits.'"  *Id.* (citation omitted).

As a general matter, "'the district court has discretion whether or not to grant leave to

amend, and its decision is not subject to review on appeal except for abuse of discretion.'"  *Shomo*

*v. New York*, 374 Fed. Appx. 180, 182 (2d Cir. 2010) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40,

42 (2d Cir. 1988)).  An opportunity to amend is not required where "the problem with [plaintiff's]

causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*,

222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).  As the Second Circuit has explained, "[w]here

it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of

discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.

1993).

The Court previously permitted Plaintiffs leave to amend their complaint.  *See* Text

Minute Entry 02/13/2023.  The only claims the Court has dismissed are the direct infringement

claims.  There are no allegations in their original or amended complaints which indicate that

Plaintiffs could state a claim for direct infringement against Meta.  As explained above, courts

repeatedly dismiss direct infringement claims against an online entity where the infringing

products were sold by a third party.  There are no allegations suggesting that Meta placed Plaintiffs' Marks onto any goods and into commerce.  As such, amendment would be futile, and Plaintiffs' request is denied.[8]

## V. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendant's motion to dismiss (Dkt. No. 17) is **DENIED in part and GRANTED in part**; and the Court further

**ORDERS** that Defendant's motion to transfer (Dkt. No. 17) is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' request to amend (Dkt. No. 21-9 at 44) is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' motion to supplement (Dkt. No. 25) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 7, 2023
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[8] On November 6, 2023, Plaintiffs filed a letter seeking to supplement their opposition to Defendant's motion to dismiss.  *See* Dkt. No. 25.  As the Court denies Defendant's motion to dismiss and transfer, Plaintiffs' letter is denied as moot.